IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

VINCENT A. CEFALU,

                Plaintiff,

      v.

ERIC H. HOLDER, JR., U.S. Attorney
General, U.S. Department of Justice,

                Defendant.

NO. C12-0303 TEH

ORDER GRANTING IN PART
AND DENYING IN PART
DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT

      This matter came before the Court on September 9, 2013, on Defendant's motion for summary judgment. After carefully considering the parties' written and oral arguments, the Court now GRANTS IN PART and DENIES IN PART the motion for the reasons set forth below.

**BACKGROUND**

      This case concerns whether Special Agent Vincent A. Cefalu ("Plaintiff") was subjected to age and disability discrimination, and retaliation for reporting the alleged discrimination at the hands of his employer, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF" or "Defendant"), an agency within the United States Department of Justice.

      Plaintiff joined the ATF in 1987 and alleges he was subjected to wrongful conduct beginning in 2004, when he transferred to the San Francisco Field Division ("SFFD")'s Dublin, California Field Office. Plaintiff alleges that his supervisors called him the "old guy" and intentionally gave him an older-model, poorly conditioned, lavender Buick to drive. From 2004-2005, he worked on a task force called "American Graffiti," which targeted drug trafficking in the Modesto area. Plaintiff alleges that a younger Special Agent on that

investigation, Christopher Bort, did less work than Plaintiff yet later received more recognition and awards.

In June 2005, Plaintiff's supervisor, Resident Agent in Charge Dennis Downs ("RAC Downs") assigned Plaintiff to work on the Robert Holloway Investigation, a multi-agency task force that included members of the Modesto Police Department.  In November 2005, RAC Downs received a request from the Modesto Chief of Police, Roy Wasden, requesting that ATF reassign Plaintiff and replace him with a different ATF Special Agent.  On or about November 30, 2005, RAC Downs and his supervisor, Assistant Special Agent in Charge Michael Gleysteen ("ASAC Gleysteen"), met with members of the Modesto Police Department.  During the meeting, the officers discussed the general direction of the Holloway Investigation, and according to RAC Downs, Chief Wasden or another member of the Modesto Police Department command staff "made the comment that Agent Cefalu was 'caustic,' 'unprofessional,' and 'a cancer' because of his abrasive personality."[1]  Declaration of Dennis Downs ("Downs Decl.") ¶ 17.  A few days later, ASAC Gleysteen, RAC Downs, Plaintiff, and ATF Special Agent Art Peralta attended a meeting wherein Peralta was assigned as a co-case agent with Plaintiff.  Plaintiff said he was "insulted and offended that Agent Peralta would become the lead agent" on the investigation because Peralta "was junior and did not know how to run such an investigation."[2]  Downs Decl. ¶ 19.  During the meeting, Plaintiff said he was removing himself from the investigation, but ASAC Gleysteen "corrected him and instructed him that he could not remove himself."  Declaration of Michael Gleysteen ("Gleysteen Decl.") ¶ 21.  On or about January 6, 2006, Plaintiff informed RAC Downs that he wanted to speak directly with Special Agent in Charge Paul Vido ("SAC Vido").  RAC Downs informed ASAC Gleysteen of this request, which was later denied.

---

[1]This statement is hearsay, but admissible when offered for its effect on RAC Downs.

[2]Statements attributed to Plaintiff are admissible as statements of a party opponent. Fed. R. Evid. 801(d)(2)(A).

On January 17, 2006, Plaintiff met with RAC Downs.  RAC Downs gave Plaintiff a copy of SAC Vido's written denial of his request for a meeting.[3]  RAC Downs averred that upon reading the written denial, Plaintiff stated "I went through you, I went through the ASAC, so fuck you."  Downs Decl. ¶ 30.  Plaintiff maintains that while he probably did say "F- you" to RAC Downs "on occasion from time to time, joking, [in] typical banter," he never told that to him when he was mad.  May 8, 2007 Cefalu Dep. at 184:7-19 (Pl.'s Ex. 1).  During this meeting, RAC Downs also informed Plaintiff that he was no longer assigned to the Holloway Investigation.  Plaintiff testified that during this January 17, 2006 meeting he told RAC Downs that he was en route to file an Equal Employment Opportunity ("EEO") complaint with ATF.  *Id.* at 12:6-23.  RAC Downs testified that he did not recall Plaintiff telling him he was on his way to make the EEO complaint.  May 9, 2007 Downs Dep. at 66:20-23 (Bouman Decl. Ex. 25)

Later that day, Plaintiff met with an ATF EEO counselor.  This meeting had been requested earlier on January 13, 2006.  The EEO counselor's notes indicate that Plaintiff alleged age discrimination.  Bouman Decl., Ex. 19 at 17.  On January 23, 2006, ASAC Gleysteen, in consultation with SAC Vido, transferred Plaintiff from the Dublin Field Office to the Sacramento, California Field Office.  Both ASAC Gleysteen and SAC Vido averred that the decision to transfer Plaintiff was made several days prior to learning about Plaintiff's EEO activity.  The stated reasons for the transfer were staffing needs and so that Plaintiff could be under the direct supervision of RAC Downs, who was based in Sacramento.

Plaintiff reported for duty in Sacramento for several days but subsequently went on medical leave for a pre-existing elbow injury.  In late January 2006, ASAC Gleysteen and RAC Downs discussed suspending Plaintiff based on his prior behavior.  RAC Downs also referred Plaintiff to ATF's Employee Assistance Program, a confidential system designed to assist employees who have encountered personal problems via letter on February 7, 2006.

---

[3]RAC Downs averred that the written denial was dated January 6, 2006, Downs Decl. ¶ 30, whereas other documents indicate it was dated January 12, 2006.  *See* Declaration of Rachel Bouman ("Bouman Decl."), Ex. 19 at 18 ¶ 11.  This discrepancy is immaterial.

United States District Court

For the Northern District of California

1    Plaintiff underwent surgery on his elbow on February 10, 2006.  Based on prior discussions

2    regarding a proposed suspension, RAC Downs drafted a Notice of Proposal of Suspension

3    for Three Days, dated February 15, 2006.  Downs Decl., Ex. E.  During this time, Plaintiff

4    was also selected by ATF to report for duty to a six-month detail in Houston, Texas, to assist

5    with Hurricane Katrina-related enforcement activities.  RAC Downs averred that he was

6    neither involved with the decision to submit Plaintiff's name for consideration nor with his

7    ultimate selection for the Houston position.  On February 21, 2006, RAC Downs gave

8    Plaintiff a copy of the notice of proposed suspension but, based on instructions from ASAC

9    Gleysteen, informed him that the suspension would be held in abeyance pending Plaintiff's

10   completion of the Houston detail.  On February 15, 2006, Plaintiff filed his first EEO

11   Complaint.  Due to his surgery and medical leave, Plaintiff never reported for duty in

12   Houston.

13          In June 2006, because Plaintiff had failed to qualify with his firearm during the

14   previous two quarters, as was required to by ATF regulations, RAC Downs took away his

15   service weapon.  Because Plaintiff could not participate in "live-fire" shooting qualifications

16   due to his elbow injury, Plaintiff asked for qualification using a computerized Firearms

17   Training Simulator known as "FATS."  Plaintiff was never allowed to qualify using FATS.

18   Plaintiff had submitted medical documentation indicating he had a permanent elbow injury

19   which made him unable to lift a firearm, and his doctor opined that he could no longer work

20   as a Special Agent.  ATF offered him a position as an Intelligence Program Specialist

21   ("IPS") position in Washington,  D.C.  Plaintiff at first refused this position and ATF moved

22   to terminate his employment.  On October 30, 2006, RAC Downs met with Plaintiff,

23   provided him a notice of proposed termination, and collected his ATF-issued Special Agent

24   badge and credentials; he collected an additional badge several days later.  Plaintiff,

25   however, reconsidered the IPS position offer and accepted it in November 2006.  Plaintiff

26   was given a 90-day transitional period, where he was instructed to report to duty under a new

27   supervisor in Dublin.  Plaintiff's second-level supervisor averred that Plaintiff did not report

28   for duty on the first day as ordered and was placed on away without leave ("AWOL") status.

United States District Court

For the Northern District of California

Declaration of Megan Bennett ("Bennet Decl."), ¶¶ 3-4 & Ex. A at ¶ 14.  Plaintiff testified that he informed his first-level supervisor that he had a previously scheduled doctor's appointment and that AWOL was thus unwarranted.  Cefalu Dep. at 149:7-20 (Pl.'s Ex. 1). Ultimately, Plaintiff never moved to Washington, D.C. for the IPS position because he underwent an additional successful surgery on his elbow, went out on further medical leave, and returned as a Special Agent in April 2007.  Upon returning, Plaintiff learned that his badges and credentials had been damaged.  Plaintiff was issued new badges and credentials.

When Plaintiff returned in April 2007 as a Special Agent, the new Special Agent in Charge Stephen Martin ("SAC Martin") initially contemplated assigning Plaintiff to Sacramento but ultimately assigned him to Dublin where he was given the role of Senior Operations Officer ("SOO").  The SOO was a position occupied by a Special Agent but with responsibility for, among other things, property management, inventory tracking, and management of the vehicle fleet.  Plaintiff remained in this position for the next several years.  In May 2010, Plaintiff appeared on a segment of CNN's Anderson Cooper 360°, in which he described how he was paid "good money for not a lot of work," and had been "idled" in his duties.  Def.'s Req. for Judicial Notice, Ex. J (video excerpt of May 27, 2010 broadcast).  On September 8, 2010, Plaintiff's supervisor, Division Operations Officer Debora Livingston, delivered a memorandum to Plaintiff outlining the specific work duties that were expected of him.

In July 2011, ATF's Internal Affairs Division and Office of Professional Responsibility and Security Operations ("OPRSO") suspended Plaintiff for six days on the basis of allegedly racist, sexually explicit, and profane emails discovered in Plaintiff's email during the course of responding to criminal discovery requests made by the criminal defendants in the criminal trial of Robert Holloway, the same multi-agency investigation to which Plaintiff was earlier assigned.  Additionally, during the Holloway criminal trial, the criminal defendants moved to suppress certain evidence on the grounds that the FBI, which eventually replaced the ATF as the federal agency in that investigation, illegally obtained a wiretap.  Plaintiff testified in support of Mr. Holloway's motion and accused other law

United States District Court

For the Northern District of California

1    enforcement officers of having committed perjury to obtain the wiretap.  The district court

2    denied the suppression motion and described Plaintiff's testimony as "reckless" and

3    "incompetent," and stated that Plaintiff did a "disservice to the agency that he continues to be

4    employed by."  July 6, 2010 Rep. Tr. of Proceedings on Ruling on Franks Motion, *United*

5    *States v. Holloway et al.*, No. 08-CR-00224-LJO-DLB (E.D. Cal. 2008) (Def.'s Req. for

6    Judicial Notice, Ex. H at 46:18-20).  ATF's OPRSO reviewed the testimony and

7    recommended Plaintiff be terminated for lack of candor and conduct unbecoming a Special

8    Agent.  In April 2011, Plaintiff had applied to become Resident Agent in Charge of the Reno

9    Field Office and was on the Best Qualified List.  The Assistant Director removed Plaintiff

10   from consideration based on a report from OPRSO that Plaintiff was facing pending

11   discipline.

12        Plaintiff first filed an EEO complaint on February 15, 2006 (Agency Case No. 2006-

13   00102), which he amended on February 25, March 23, August 16, October 20, and

14   November 29, 2006.  Plaintiff filed an additional EEO complaint on August 4, 2008 (Agency

15   Case No. 2008-00411), which he amended on November 4, 2010, January 6, 2011, August

16   12, 2011, and March 8, 2012.  Plaintiff filed a third EEO complaint on January 20, 2012,

17   which he also amended several times.[4]

18        Plaintiff initiated this case on January 19, 2012.  Docket No. 1.  Plaintiff's asserts four

19   causes of action in his Second Amended Complaint ("SAC"):  (1) age discrimination,

20   pursuant to the Age Discrimination in Employment Act, § 29 U.S.C. § 623(a),  SAC ¶¶ 142-

21   49; (2) retaliation based on Plaintiff's complaints of age discrimination, *id.* ¶¶ 155-59;

22   (3) disability discrimination pursuant to the Rehabilitation Act, § 29 U.S.C. § 791, *id.* ¶¶ 150-

23   54; and (4) retaliation based on Plaintiff's complaints of disability discrimination, *id.* ¶¶ 160-

24   64.  SAC, Docket No. 50.

25        Defendant moved for summary judgment on all claims on August 5, 2013.  Docket

26   No. 86.  Upon reviewing the motion, Plaintiff's opposition, Docket No. 114, and Defendant's

27

28        [4]Bouman Decl., Exs. 1-18; Mot. at 3-5; Pl.'s Ex. 15.  The Court reviews the record
     here *de novo* with no consideration of the results of any prior EEOC proceedings.

reply, Docket No. 116, the Court ordered counsel to address specific questions and provide

citations to the record during the hearing on the motion, which was held on September 9,

2013.  Docket No. 118.

**LEGAL STANDARD**

Summary judgment is appropriate when there is no genuine dispute as to material

facts and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

Material facts are those that may affect the outcome of the case.  *Anderson v. Liberty Lobby,*

*Inc.,* 477 U.S. 242, 248 (1986).  A dispute as to a material fact is "genuine" if there is

sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  *Id.*  The

Court may not weigh the evidence and must view the evidence in the light most favorable to

the nonmoving party.  *Id.* at 255.  The Court's inquiry is "whether the evidence presents a

sufficient disagreement to require submission to a jury or whether it is so one-sided that one

party must prevail as a matter of law."  *Id.* at 251-52.

A party seeking summary judgment bears the initial burden of informing the Court of

the basis for its motion, and of identifying those portions of the pleadings and discovery

responses that "demonstrate the absence of a genuine issue of material fact."  *Celotex Corp.*

*v. Catrett,* 477 U.S. 317, 323 (1986).  Where the moving party will have the burden of proof

at trial, it must "affirmatively demonstrate that no reasonable trier of fact could find other

than for the moving party."  *Soremekun v. Thrifty Payless, Inc.,* 509 F.3d 978, 984 (9th Cir.

2007).  However, on an issue for which its opponents will have the burden of proof at trial,

the moving party can prevail merely by "pointing out . . . that there is an absence of evidence

to support the nonmoving party's case."  *Celotex,* 477 U.S. at 325.  If the moving party meets

its initial burden, the opposing party must "set out specific facts showing a genuine issue for

trial" to defeat the motion.  Fed. R. Civ. P. 56(e)(2); *Anderson,* 477 U.S. at 256.

A court need consider only the materials cited by the parties.  Fed. R. Civ. P. 56(c)(3).

A district court has no independent duty "to scour the record in search of a genuine issue of

triable fact" and may "rely on the nonmoving party to identify with reasonable particularity

the evidence that precludes summary judgment." *Keenan v. Allan,* 91 F.3d 1275, 1279 (9th Cir. 1996) (internal quotation marks omitted); *see also Carmen v. San Francisco Unified Sch. Dist.,* 237 F.3d 1026, 1031 (9th Cir. 2001) ("The district court need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found.").

**DISCUSSION**

**I.    Age Discrimination in Employment Act**

The ADEA prohibits an employer from discriminating "because of [an] individual's age." *Shelley v. Geren*, 666 F.3d 599, 606-07 (9th Cir. 2012) (citing 29 U.S.C. § 623(a)(1)). In an ADEA disparate treatment claim, a plaintiff retains at all times the burden of persuasion to establish, by a preponderance of the evidence, that age was the "but-for" cause of an employer's adverse action. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180 (2009). The "burden-shifting evidentiary framework of *McDonnell Douglas*" continues to apply to motions for summary judgment on ADEA claims. *Shelley*, 666 F.3d at 607-08 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

To survive summary judgment on the ADEA claim, Plaintiff must first establish a prima facie case of age discrimination. *Id.* (citing *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1280-81 (9th Cir. 2000)). To establish a prima facie case under the ADEA, Plaintiff here must demonstrate that he: (1) was member of the protected class (at least age 40); (2) was performing his job satisfactorily; (3) suffered an adverse employment action; and (4) was replaced by a substantially younger employee with equal or inferior qualifications. *Coleman,* 232 F.3d at 1281.

If Plaintiff succeeds, the burden of production shifts to Defendant to articulate a legitimate, non-discriminatory reason for its adverse employment action. *Shelley*, 666 F.3d at 608 (citing *Coleman*, 232 F.3d at 1281). "It is then [Plaintiff's] task to demonstrate that there is a material genuine issue of fact as to whether the employer's purported reason is pretext for age discrimination. At trial, he must carry the burden to prove that age was the

United States District Court

For the Northern District of California

'but-for' cause of his [disparate treatment claim]." *Id.* (internal citation omitted).  A plaintiff may meet the burden to show pretext using either direct or circumstantial evidence.  *Coghlan v. Am. Seafoods Co. LLC.*, 413 F.3d 1090, 1094-95 (9th Cir. 2005).  Direct evidence is evidence "which, if believed, proves the fact [of discriminatory animus] without inference or presumption" and usually "consists of clearly sexist, racist, or similarly discriminatory statements or actions by the employer." *Id.* at 1095 (internal citation and quotation omitted). Circumstantial evidence is evidence that "requires an additional inferential step to demonstrate discrimination" such as by showing the "employer's proffered explanation for the adverse action is 'unworthy of credence,'" but circumstantial evidence "must be 'specific and substantial' to defeat the employer's motion for summary judgment." *Id.* (citing *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1222 (9th Cir. 1998)).

Defendant moved for summary judgment motion on numerous factual allegations contained in the SAC that conceivably sound under the ADEA.  Plaintiff meets the first element of a prima facie ADEA claim because he was, at all relevant times, over forty years old, Def.'s Resp. to First Reqs. for Admiss. at ¶ 12 (Pl.'s Ex. B) (admitting this element).  As discussed below, however, Plaintiff failed to present evidence establishing all required elements of his prima facie case for each complained-of instance of age discrimination.  The Court addresses whether summary judgment is warranted for each of these factual "claims."

### 1.     Government-Issued Vehicle

Plaintiff claims he arrived at the SFFD in 2004 and was given an old, lavender Buick that needed repairs.  SAC ¶¶ 29-31.  Defendant moved for summary judgment on this claim, and Plaintiff failed to put forth any affirmative evidence relating to it or otherwise address it in his opposition.  The Court GRANTS summary judgment on this claim as unopposed.

### 2.     "Old-Guy" Comments

The SAC alleges Plaintiff's colleagues and supervisors made disparaging remarks about his age, including calling him the "old-guy."  SAC ¶¶ 27-28, 30.  Defendant moved for summary judgment on this claim, and Plaintiff failed to cite any evidence that these remarks were made, let alone that they would be anything other than unactionable "stray remarks."

*Merrick v. Farmers Ins. Grp.*, 892 F.2d 1434, 1438 (9th Cir. 1990).  Plaintiff did not present evidence linking such comments to any adverse employment action or decision to replace Plaintiff with "a substantially younger employee with equal or inferior qualifications."  *Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 917 (9th Cir. 1996).  Thus, Plaintiff failed to establish a prima facie case relating to any "old-guy" comments under the ADEA, and the Court GRANTS summary judgment on this claim.

### 3.    American Graffiti Investigation

Plaintiff alleges that he did the majority of work on a task force investigation called "American Graffiti," which targeted narcotics and firearms trafficking in the Modesto, California area, while a younger Special Agent, Chris Bort, did less work yet received a Quality Step Increase ("QSI") and other recognition.  SAC ¶¶ 33-41.  Plaintiff failed to present any evidence establishing that he "was treated less favorably than" Bort or that Bort was "a similarly situated younger employee."  *Coleman,* 232 F.3d at 1280-81.  Thus, Plaintiff failed to establish his prima facie case.

Even if he had met this burden, Defendant articulated a legitimate, non-discriminatory reason for Bort's receipt of the QSI.  Bort was not similarly situated because he was a GS-11 Special Agent, while Plaintiff was a GS-13 Special Agent.  The QSI is awarded to an employee who "consistently performs at a level above his or her current grade and step level."  Gleysteen Decl. ¶ 6.  RAC Armando Salas averred that he assessed that Bort's work performance was two levels higher than his GS-11 grade.  Declaration of Armando Salas ("Salas Decl.") ¶ 14.  As a result, Salas nominated Bort and not Plaintiff for the QSI because the job description and standards are higher for the GS-13 position than the GS-11 position, and while Plaintiff performed at an acceptable level based on his GS-13 pay grade and experience, Bort performed at an exceptional level based on his lower grade.  Salas Decl. ¶ 15.  Plaintiff failed to present any evidence to support the claim that Plaintiff did the majority of work or that Bort was similarly situated, and also failed to present evidence showing that RAC Salas' legitimate, non-discriminatory reasons for Bort's QSI were pretext.  Accordingly, the Court GRANTS summary judgment on this claim.

10

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

### 4.      Robert Holloway Investigation

Plaintiff argues that the appointment of Special Agent Art Peralta as a co-case agent on the Holloway Investigation and Plaintiff's ultimate reassignment from that case were instances of age discrimination. Opp'n at 24; SAC ¶¶ 42-53. Plaintiff failed to present evidence establishing his prima facie case. Plaintiff presented no evidence that demonstrates Plaintiff was "performing his job satisfactorily" at the time of Peralta's appointment or his reassignment, aside from the assertion in his opposition brief that he had a successful career as a Special Agent, Opp'n at 1, and did not receive his first unsatisfactory performance evaluation until September 2006, Opp'n at 24. Plaintiff additionally presented no evidence that Peralta was a "substantially younger employee of equal or inferior qualifications." *Coleman*, 232 F.3d at 1281. Thus, Plaintiff failed to present evidence that establishes the required elements of his prima facie case.

Even if Plaintiff he had met this burden, Defendant articulated legitimate, non-discriminatory reasons for these challenged actions. Defendant presented evidence that shows ASAC Gleysteen and RAC Downs appointed Peralta as a co-case agent, and then removed Plaintiff from the investigation because of requests by local law enforcement due to Plaintiff's perceived unprofessional behavior and reports of his inability to operate effectively with local law enforcement officers.[5] Downs Decl. ¶¶ 11-18; Gleysteen Decl. ¶¶ 11-17.

Rather than present "specific and substantial" evidence that these proffered reasons were pretextual, Plaintiff instead argues that Defendant's proffered explanations for Plaintiff's removal are inconsistent. Opp'n at 24. The two "inconsistencies" cited by Plaintiff are (1) if Plaintiff was unprofessional and a "cancer" to the investigation, ASAC Gleysteen would not have prevented Plaintiff from taking himself off the investigation; and (2) if Plaintiff was incompetent, ASAC Gleysteen would not have kept him on the

_____

[5]To the extent statements made by local law enforcement members to RAC Downs and ASAC Gleysteen about Plaintiff are hearsay, they are admissible for their effect on RAC Downs and ASAC Gleysteen in relation to their decision to appoint Peralta and later remove Plaintiff.

11

investigation.  Opp'n at 24.  These arguments, however, are not "specific and substantial" evidence of a genuine dispute of material fact that ATF's purported reasons were pretext for age discrimination.  *Shelley*, 666 F.3d at 607.[6]  Because Plaintiff failed to produce evidence that established a prima facie case or created a genuine issue of material fact as to pretext, summary judgment on this claim is therefore GRANTED.

### 5.    Additional Potential ADEA Claims

In the single page of Plaintiff's opposition brief devoted to applying the ADEA to the facts of the case, Plaintiff states that he "alleges he suffered numerous adverse employment actions, since he began working for the SFFD, 'to include but limited to, being removed as case agent in the Holloway investigation, being transferred several times, and being removed from the [Best Qualified List] for the RAC of Reno position.'"  Opp'n at 24.  Plaintiff's opposition brief analyzed only the Holloway Investigation claim, and directed the Court to no other evidence that attempts to establish an ADEA prima facie case related to the several transfers and removal from the Best Qualified List for the Reno RAC position, which he cites as examples of age discrimination.  Plaintiff's also asserts that he has "suffered numerous, adverse employment actions" and that "[a]ll of Defendant's legitimate, non-discriminatory reasons are discussed in the Retaliation section" of Plaintiff's opposition brief.  Opp'n at 24.  Plaintiff's apparent request for the Court to engage in analysis-by-incorporation for his ADEA claim, however, is not a substitute for Plaintiff satisfying his burden of presenting evidence that establishes his prima facie case for age discrimination under the ADEA, and directing the Court to that evidence with specific citations.  He has not done so here.  Summary judgment is appropriate where plaintiff "fail[s] to provide admissible evidence to

---

[6]Plaintiff cites *Dominguez-Curry v. Nevada Transportation Department,* 424 F.3d 1027, 1037 (9th Cir. 2005) (citing *Godwin,* 150 F.3d at 1220-22) in support of his argument. However, the plaintiff in that case relied on direct evidence of discriminatory animus; Plaintiff presents no such evidence here.  Additionally, Plaintiff cites *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 147 (2000) for the proposition that a fact-finder may infer retaliation from the falsity of an employer's explanation.  Opp'n at 14.  A "factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) *may, together with the elements of the prima facie case*, suffice to show intentional discrimination."  *Reeves,* 530 U.S. at 147 (emphasis added) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993).  Plaintiff, however, failed to establish the elements of a prima facie case here.

United States District Court

For the Northern District of California

establish a genuine issue of material fact regarding the requisite element" of a claim. *Boyd v. City of Oakland*, 458 F. Supp. 2d 1015, 1052 (N.D. Cal. 2006).  "The district court need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found." *Carmen*, 237 F.3d at 1031.  Thus, Defendant's motion for summary judgment on Plaintiff's ADEA cause of action is GRANTED.

## II.    Rehabilitation Act

The Rehabilitation Act of 1973, 29 U.S.C. § 791 *et seq.*, prohibits the ATF from discriminating against employees with disabilities.  Section 504 of the Rehabilitation Act provides:

> No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity . . . conducted by any Executive agency . . .

29 U.S.C. § 794(a).

Plaintiff asserts one count of disability discrimination under the Rehabilitation Act.  SAC ¶¶ 142-49.  The Court can discern only two grounds of disability discrimination from the SAC and Plaintiff's opposition brief:  (1) that Plaintiff was not allowed to qualify to carry an ATF-issued firearm using the FATS computerized simulator; and (2) that Plaintiff was offered the IPS position in Washington, D.C. rather than being permitted to remain a Special Agent.  Neither of these claims survive summary judgment because Plaintiff was not a "qualified individual" as a matter of law.  Thus, Plaintiff cannot meet his prima facie burden of producing evidence that demonstrates a genuine issue of material fact regarding whether he was an otherwise qualified individual with a disability who was discriminated against due to his disability in violation of the Rehabilitation Act.  *Mustafa v. Clark Cnty. Sch. Dist.*, 157 F.3d 1169, 1175-76 (9th Cir. 1998).

To state a prima facie case under the Rehabilitation Act, a plaintiff must demonstrate that (1) he is a person with a disability; (2) who is otherwise qualified for employment; and

United States District Court

For the Northern District of California

(3) suffered discrimination because of his disability.  *Walton v. U.S. Marshals Serv.*, 492 F.3d 998, 1005 (9th Cir. 2007).

The first element of Plaintiff's prima facie case – whether Plaintiff is "disabled" – requires an analysis of the relevant ADA definitions of disability.[7]  Neither Plaintiff nor Defendant briefed the issue of whether Plaintiff's elbow injury was, within the meaning of the ADA:  (A) a physical impairment that substantially limits one or more of the major life activities of such individual; (B) whether there was a record of such an impairment, or (C) whether he was regarded as having such an impairment.  *Walton*, 492 F.3d at 1005.  Under the more rigorous pre-ADAAA standard applicable in 2006, "a plaintiff alleging substantial limitation in the major life activity of working 'must present specific evidence about relevant labor markets to defeat summary judgment' and 'identify what requirements posed by the class of . . . jobs . . . were problematic in light of the limitations imposed on [him].'"  *Id.* at 1009 (ellipses in original) (citing *Thornton v. McClatchy Newspapers, Inc.*, 261 F.3d 789, 795-96 (9th Cir. 2001) *opinion clarified*, 292 F.3d 1045 (9th Cir. 2002)).[8]  Prior to oral argument, the Court issued questions to the parties to clarify whether Plaintiff, in fact, was disabled under this definition.  While there is evidence in the record that Plaintiff's elbow injury prevented him from continuing to work as a Special Agent and carry a firearm,

---

[7]The standards used to determine whether an act of discrimination violated the Rehabilitation Act are the same standards applied under the Americans with Disabilities Act ("ADA").  *Coons v. Sec'y of U.S. Dep't of Treasury*, 383 F.3d 879, 884 (9th Cir. 2004) (citing 29 U.S.C. § 794(d) and 29 C.F.R. § 1614.203(b)).  Congress amended the ADA's definition of disability with the ADA Amendments Act of 2008,  Pub. L. No. 110–325, 122 Stat. 3553 ("ADAAA").  The ADAAA definition of disability does not apply retroactively to conduct prior to January 1, 2009.  *Becerril v. Pima Cnty. Assessor's Office*, 587 F.3d 1162, 1164 (9th Cir. 2009).  Because the allegedly discriminatory actions related to FATS qualification and the IPS position occurred prior to January 1, 2009, the pre-2009 ADA provisions and authorities interpreting those provisions apply.

[8]The Court notes that *Thornton*'s reasoning relies on *Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999), and that "[o]ne of the main purposes of the ADAAA was to repudiate the Supreme Court's narrowing interpretations of the term 'disability' in *Sutton* . . . ."  *Curry v. Tilton*, No. C-07-0775 EMC PR, 2012 WL 967062, at *9-10 (N.D. Cal. Mar. 21, 2012).  However, because the conduct at issue here occurred in 2006, the Court applies the law as it existed when Defendant made the challenged decisions.  *Becerril*, 587 F.3d at 1164; *Curry*, 2012 WL 967062, at *10 (same).

United States District Court

For the Northern District of California

1   Declaration of Wanda Gill ("Gill Decl."), Exs. B-F, "the inability to perform a single,

2   particular job does not constitute a substantial limitation in the major life activity of

3   working." *Coons,* 383 F.3d at 885 n. 1 (citing *Deppe v. United Airlines,* 217 F.3d 1262, 1265

4   (9th Cir. 2000)). *Compare with* Opp'n at 22 n. 7 (concluding without analysis or citation to

5   evidence that "Plaintiff's elbow injury prevented him from the major life activity of

6   working"). There is no evidence in the record that Plaintiff's elbow injury was a physical

7   impairment that substantially limited a major life activity, such as work, nor is there evidence

8   of a record of such an impairment, or that he was regarded as having an impairment that

9   substantially limited a major life activity as opposed to one that merely prevented him from

10   working as a Special Agent. To the extent he was merely regarded as having such a physical

11   impairment, there is no duty to accommodate an employee in an "as regarded" case if the

12   individual is not actually disabled. *Kaplan v. City of N. Las Vegas,* 323 F.3d 1226, 1233 (9th

13   Cir. 2003). However, the Court does not rely on this issue because the parties did not brief it.

14   Rather, the Court finds that Plaintiff cannot establish his prima facie case because he was not

15   a "qualified individual."

16       A "qualified individual" under the Rehabilitation Act is an individual with a disability

17   "who, with or without reasonable accommodation, can perform the essential functions of

18   [the] position." *Mustafa,* 157 F.3d at 1175 (citing 29 C.F.R. § 1630.2(m) (internal quotation

19   marks omitted)). "Essential functions are the fundamental duties of the relevant position."

20   *Id.* (citing 29 C.F.R. § 1630.2(n)(1)).

21       Defendant argues that Plaintiff was not a qualified individual as a matter of law

22   because in June 2006 his doctors had opined that he had a permanent elbow injury that

23   prevented him working as a Special Agent, including express findings that he could not lift a

24   firearm. Mot. at 17. Defendant argues that because the ability to carry and use a firearm is

25   an essential function of the ATF Special Agent position, and because Plaintiff could not have

26   performed this function, he was not a qualified individual under the Rehabilitation Act. *Id.*

27   Plaintiff argues that carrying a firearm is not an essential function of the ATF Special Agent

28

15

**United States District Court**
For the Northern District of California

position, but rather "[i]t is an essential function of the job to *qualify to carry* a firearm." Opp'n at 17 (emphasis in original).

The Court finds that the ability to carry and use a firearm is an essential function of the ATF Special Agent position.  ATF Special Agents are classified by the U.S. Office of Personnel Management ("OPM") as a Criminal Investigation Series 1811 position.  The OPM individual occupational and medical requirements of the 1811 series state that the duties of these positions include "moderate to arduous physical exertion" involving use of firearms, manual dexterity with "comparatively free motion of" the elbow, and that any physical condition that would cause the applicant "to be a hazard to himself/herself, or others is disqualifying."[9]  The ATF Use of Force and Weapons Policy, ATF O 3010.1 ("Weapons Policy") further states that Special Agents are authorized "to bear firearms in furtherance of official law enforcement operations," are expected to be "available for duty 24 hours a day, 7 days a week in a standby or on-call status," and are required "to be armed at all times and expected to protect themselves and the public" by using firearms pursuant to the Policy. Weapons Policy ¶ 31(b) (Declaration of Mark Conrad ("Conrad Decl."), Ex. G).  The finding that ability to carry and use a firearm is an essential function of similar federal law enforcement positions is in accord with other courts that have examined the issue.  *See, e.g.*, *Puletasi v. Wills*, 290 F. App'x 14, 18 (9th Cir. 2008) (finding ICE criminal investigator not qualified for position where due to injury he could not perform essential functions of job including handling a firearm); *Kaplan,* 323 F.3d at 1230–31; *Carroll v. Holder*, No. CIV. 09-3093-CL, 2011 WL 7091804, at *28 (D. Or. Sept. 30, 2011) *report and recommendation adopted* No. CIV. 09-3093-CL, 2012 WL 214599 (D. Or. Jan. 24, 2012) (finding that "the ability to carry and use a firearm is an essential function" of the 1811 series position of FBI Special Agent, and therefore that plaintiff was not a qualified individual as defined by the

---

[9]See Office of Pers. Mgmt., Standards: Criminal Investigation Series 1811, *available at* https://www.opm.gov/policy-data-oversight/classification-qualifications/general-schedule-qualification-standards/1800/criminal-investigation-series-1811/.  The Court takes judicial notice of the document, Fed. R. Evid. 201, as requested by Defendant during the hearing in response to questions from the Court.

1  Rehabilitation Act because no reasonable accommodation would have allowed her to perform

2  this essential function of the position).

3        There is no genuine dispute of material fact as to this finding.  Plaintiff cites to the

4  same Weapons Policy to argue that it permits a Special Agent who is pregnant or who has a

5  temporary or short term medical condition to qualify for firearms proficiency using

6  alternative testing methods.  Weapons Policy ¶ 67(d), Conrad Decl., Ex. G.  However, the

7  availability of alternative qualification procedures assumes that the Special Agent can

8  nonetheless perform the essential functions of the job.  The same Weapons Policy cited by

9  Plaintiff also clearly provides that leave status does not suspend a Special Agent's authority

10  to carry firearms and that Special Agents "are authorized to be armed at all times and

11  expected to protect themselves and the public . . . ."  *Id.* ¶ 31(b).  During oral argument,

12  Plaintiff presented to the Court descriptions for the positions of GS-1811-13 Criminal

13  Investigator and Criminal Investigator (Senior Operations Officer) positions.[10]  Each states

14  that the applicant "[m]ust display required proficiency with firearms."  Neither of these

15  documents, however, raises a genuine issue of material fact as to whether ability to carry and

16  use a firearm is an essential function of the Special Agent position, and in fact, the

17  documents actually reinforce the conclusion that it is an essential function.  The Court

18  therefore finds that ability to carry a firearm is an essential function of the ATF Special

19  Agent position.

20        Plaintiff's doctors opined that he could not carry a firearm or perform the duties of a

21  Special Agent due to his elbow injury.  From June to September, 2006, Plaintiff submitted

22  several doctors' notes to the Office of Workers Compensation Programs, an organization

23  within the Department of Labor, that administers the claims of federal employees who seek

24  benefits in connection with work-related injuries.  Gill Decl. ¶¶ 1-3.  In a June 27, 2006 letter

25

26        [10]Neither of these documents were authenticated, but bear the bates labels
   USA_002910 and USA_000842, respectively.  The Court therefore may consider these
27  documents.  *See Orr v. Bank of Am.*, 285 F.3d 764, 777 n. 20 (9th Cir. 2002) (noting that
   "documents produced by a party in discovery were deemed authentic when offered by the
28  party-opponent" in *Maljack Prods., Inc. v. GoodTimes Home Video Corp.*, 81 F.3d 881, 889
   n. 12 (9th Cir. 1996).

17

**United States District Court**
For the Northern District of California

1    to the Department of Labor, Plaintiff's orthopedic surgeon Dr. Robert Caton, M.D. wrote the

2    following:

> This letter is in regard to Vincent Cefalu.  He is seen in follow-up of a recent surgery done on February 10, 2006 . . .  At the present time I am going to make him permanent and stationary but he is going to have permanent job restrictions . . .  1.  No repetitive motion of his right elbow . . . .  In reference to his specific job duties, he does not appear to be able to work as a special agent any more at this time, due to the fact that he cannot be lifting a gun as it is felt to be not medically reasonable for him as he could cause damage to himself or fellow employees.  He is unable to hold a gun in a prolonged position with the wrist in extension.

9    Gill Decl., Ex. A at 1-2.  Plaintiff's physician explicitly stated that Plaintiff's elbow injury

10   was permanent, that he could not lift a gun, and he opined that to lift a gun could cause

11   damage to himself or others, and that he could no longer work as a Special Agent.  While

12   Plaintiff argues that his disability "was not permanent," Opp'n at 18, Plaintiff cites no

13   evidence in support of this assertion and directs the Court to no evidence that might allow a

14   reasonable fact-finder to infer that anyone at ATF understood Plaintiff's elbow injury to be

15   only temporary at the time the challenged conduct occurred.[11]  The physical limitation and

16   proscriptions identified by Plaintiff's physician overlap with the OPM occupational and

17   medical requirements of the Series 1811 criminal investigator position (lifting and carrying a

18   firearm, manual dexterity of the elbow, posing potential hazard to himself or others).

19   Therefore, Plaintiff could not have performed the essential functions of the ATF Special

20   Agent position "with or without reasonable accommodation."  *Mustafa*, 157 F.3d at 1175.

21   Plaintiff thus was not a "qualified individual" under the Rehabilitation Act.

22       Because Plaintiff cannot establish a prima facie case that he was an otherwise

23   qualified individual with a disability who was discriminated against due to his disability, his

24   Rehabilitation Act claim fails as a matter of law.  *Coons*, 383 F.3d at 886.  Accordingly,

---

25       [11]Plaintiff presented a physicians note from Dr. Caton, dated July 3, 2006, opining that

26   live-fire firearms qualifications would have a negative or detrimental effect on Plaintiff's "current medical condition" and that computer simulated video firearms training would not.

27   Pl.'s Ex. 4.  This evidence, however, does create a genuine issue of material fact as to whether Plaintiff's physicians had opined that he could not lift a firearm, that to do so could

28   endanger himself or others, and that he could not perform the duties of an ATF Special Agent.

Plaintiff's claims that ATF refused to allow him to qualify using the FATS computer simulator and that ATF failed to reasonably accommodate Plaintiff when it offered him the IPS position in Washington, D.C. are not actionable.  The Court GRANTS Defendant's motion for summary judgment as to Plaintiff's Rehabilitation Act cause of action.

## III.    Retaliation Under the ADEA and Rehabilitation Act

The ADEA and the Rehabilitation Act prohibit federal employers from retaliating against employees who challenge discrimination based on age or disability, respectively. *Gomez-Perez v. Potter*, 553 U.S. 474, 477 (2008) (citing 29 U.S.C. § 633a(a) (ADEA); 29 U.S.C. § 794(d) (Rehabilitation Act incorporating ADA's prohibition against retaliation, 42 U.S.C. § 12203(a)).  Even when an employee is not disabled under the ADEA or the Rehabilitation Act, the court must still address his retaliation claim.  *Coons*, 383 F.3d at 887 (9th Cir. 2004) (citing *Heisler v. Metro. Council*, 339 F.3d 622, 630 n.5 (8th Cir. 2003) ("the ADA prohibits an employer from retaliating against an employee who seeks an accommodation in good faith").  In *Coons*, the Ninth Circuit articulated the analytical framework as follows:

> A prima facie case of retaliation requires a plaintiff to show:  (1) involvement in a protected activity, (2) an adverse employment action and (3) a causal link between the two.  The plaintiff must present evidence adequate to create an inference that an employment decision was based on an illegal discriminatory criterion.  In other words, [the Plaintiff] must establish a link between his [protected activity and the adverse employment action].  Once the plaintiff establishes a prima facie case, the employer has the burden to present legitimate reasons for the adverse employment action.  If the employer carries this burden, and plaintiff demonstrates a genuine issue of material fact as to whether the reason advanced by the employer was a pretext, then the retaliation case proceeds beyond the summary judgment stage.

383 F.3d at 887 (internal quotations, citations, and emphases omitted).  "An adverse employment action is any adverse treatment that is based on a retaliatory motive and is reasonably likely to deter the charging party or others from engaging in protected activity."  *Poland v. Chertoff*, 494 F.3d 1174, 1180 (9th Cir. 2007) (quotation marks omitted) (citing *Ray v. Henderson*, 217 F.3d 1234, 1242-43 (9th Cir. 2000).  Focusing on the "materiality of the challenged action and the

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

perspective of a reasonable person in the plaintiff's position . . . screen[s] out trivial conduct while effectively capturing those acts that are likely to dissuade employees from complaining or assisting in complaints about discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 69-70 (2006).  Thus, a challenged action is materially adverse when it "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68. An adverse employment action must be sufficiently "final or lasting" to create a prima facie case. *Brooks v. City of San Mateo*, 229 F.3d 917, 930 (9th Cir. 2000) (holding negative performance evaluation not "sufficiently final to constitute an adverse employment action" because plaintiff appealed evaluation but abandoned her job and appeal could theoretically have changed the evaluation).

Although Plaintiff has not specifically enumerated in his Second Amended Complaint the precise legal theory associated with each complained-of incident, the remainder of Plaintiff's claims generally sound under a retaliation theory, and the Court analyses each accordingly.

### 1.     Retaliation for Claims Initiated Prior To Engaging In Protected Activity

To the extent Plaintiff's retaliation claims are based on events that occurred prior to Plaintiff's initiation of contact with EEO counselor Larry Sovinsky ("Sovinsky"), these claims fail as a matter of law. *Coons*, 383 F.3d at 887.  The evidence indicates Plaintiff first engaged in protected activity as early as January 13, 2006, when he contacted Sovinsky to set up an appointment to meet for his initial EEO interview on January 17, 2006.  Bouman Decl., Ex. 19 at 16.  Filing of EEO complaints is a protected activity. *Poland*, 494 F.3d at 1180.  "[C]ontact with the EEO counselor [is] itself 'protected activity.'" *Hashimoto v. Dalton*, 118 F.3d 671, 680 (9th Cir. 1997).  Plaintiff, however, presents no affirmative evidence that he otherwise engaged in protected activity prior to January 13, 2006.  Accordingly, summary judgment is GRANTED as to all retaliation claims occurring temporally prior to this protected activity, including any claims arising out of the issuance of a government-owned vehicle (SAC ¶¶ 29-31), "old-guy" remarks (SAC ¶¶ 27-28, 30), the American Graffiti Investigation (SAC ¶¶ 33-41), removal from the Robert Holloway Investigation (SAC ¶¶ 42-53), and SAC Vido's written denial of Plaintiff's

1    request to speak directly regarding the Holloway investigation, which was dated no later than

2    January 12, 2006.  Bouman Decl., Ex. 19 at 18, ¶ 11.

3             **2.**     **Referral to ATF's Employee Assistance Program**

4         On February 7, 2006, RAC Downs gave Plaintiff a memo referring him to ATF's

5    Employee Assistance Program for anger management and other counseling services.  Downs

6    Decl. ¶ 42.  The confidential EAP referral memo was not an adverse employment action because

7    Plaintiff voluntarily referred himself to the EAP prior to January 31, 2006.  Pl.'s Resps. To

8    Def.'s Reqs. For Admiss. at 7 (Pl.'s admission), Conrad Decl., Ex. E.; *see Semsroth v. City of*

9    *Wichita*, 555 F.3d 1182, 1187 (10th Cir. 2009) (no material adversity when employee voluntarily

10    submitted to fitness-for-duty exam).  Plaintiff did not address or present any evidence related to

11    this claim.  Summary judgment for this claim is GRANTED.

12             **3.**     **January 2006 Transfer to Sacramento Field Office**

13         Plaintiff contends that his January 2006 transfer to the Sacramento Field Office was

14    retaliation for initiating his first EEO Complaint.  Opp'n at 15.  Defendant maintains the decision

15    to transfer Plaintiff was made prior to when any of the "relevant officials" knew Plaintiff had

16    engaged in protected activity.  Mot. at 15.  Plaintiff engaged in protected activity when he

17    contacted Sovinsky on January 13, 2006 and met with him on January 17, 2006.  *Hashimoto*, 118

18    F.3d at 680.   The transfer to the Sacramento Field Office is "cognizable as an adverse

19    employment action if [it would be] reasonably likely to deter employees from engaging in

20    protected activity." *Ray*, 217 F.3d at 1243.  Plaintiff contends the transfer would have resulted

21    in increased commute distance and a decrease in pay due to lower cost of living adjustments.

22    Opp'n at 15.  ASAC Gleysteen testified that permanent reassignment to the Sacramento Office

23    would have rendered Plaintiff ineligible for a cost of living adjustment available at the San

24    Francisco Field Division – although ASAC Gleysteen testified he was not aware of it at the time

25    of the transfer – and that Permanent Change of Station ("PCS") funds would not have been

26    available to assist in Plaintiff's transfer.  May 10, 2007 Gleysteen Dep. at 73:22-74:20; 78:19-

27    79:18 (Bouman Decl., Ex. 26).  A transfer that is implemented and that would ultimately result

28    in increased commute time or a decrease in compensation might reasonably be likely to deter an

United States District Court

For the Northern District of California

1  employee from engaging in protected activity and is therefore an adverse employment action.

2  *Ray*, 217 F.3d at 1243; *White*, 548 U.S. at 68.  Defendant argues that the transfer cannot

3  constitute adverse employment action since Plaintiff "showed up one day" and never reported

4  for duty there again due to medical leave.  Reply at 13.  RAC Downs testified that Plaintiff "was

5  there for four days," then went on leave, and then had surgery.  May 9, 2007 Downs Dep. at

6  72:11-23 (Bouman Decl., Ex. 25).  Unlike a transfer that is only contemplated or never actually

7  implemented, which would not be reasonably likely to deter an employee from engaging in

8  protected activity, the January 2006 transfer was implemented, and even though Plaintiff went

9  out on leave and the transfer was later reversed, it was the type of adverse employment action

10  that could deter a reasonable employee from engaging in protected activity.

11       Defendant argues Plaintiff cannot meet his prima facie burden because he cannot show

12  a causal link between Plaintiff's protected activity on January 17, 2006 and SAC Vido's and

13  ASAC Gleysteen's decision to transfer Plaintiff on January 19, 2006.  Defendant presented

14  evidence that neither knew that Plaintiff engaged in protected activity at the time the decision

15  was made.  Gleysteen Decl. ¶ 31-32; Declaration of Paul Vido ¶ 19, Bouman Decl., Ex. 30.

16  "Essential to a causal link is evidence that the employer was aware that the plaintiff had engaged

17  in the protected activity."  *Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir. 1982).

18  Nonetheless, there is sufficient evidence in the record from which a reasonable fact-finder could

19  conclude that ASAC Gleysteen or SAC Vido had knowledge of the protected activity.  Plaintiff

20  testified that he told RAC Downs he was on his way to file an EEO complaint during the

21  January 17, 2006 meeting.  Cefalu Dep., at 12:3-23 (Pl.'s Ex. 1).  RAC Downs testified that he

22  did not recall Plaintiff telling him he was on his way to make the EEO complaint.  Bouman

23  Decl., Ex. 25 at 66:20-23. After this meeting, RAC Downs testified that he contacted ASAC

24  Gleysteen and "let him know what had happened."  Downs. Dep. at 73:14-22; 67:20-23

25  (Bouman Decl., Ex. 25).  ASAC Gleysteen testified that he spoke with RAC Downs about the

26  Sacramento transfer on January 18, 2006.[12]  On January 19, 2006, ASAC Gleysteen decided to

---

27

28  [12]"Q: Before making the decision to transfer Mr. Cefalu, did you have discussions about Mr. Cefalu's transfer with Mr. Downs?
    A: Well, let's – what started the situation was an incident on January 17th or

United States District Court

For the Northern District of California

1    transfer Plaintiff to the Sacramento Field Office, effective January 22, 2006.  Gleysteen Decl.

2    ¶ 31. Viewing the evidence in the light most favorable to Plaintiff, Plaintiff told RAC Downs

3    about his intention to engage in protected activity, RAC Downs spoke with ASAC Gleysteen

4    either on the same day as his meeting with Plaintiff or the day after, and one or two days later

5    ASAC Gleysteen made the decision to transfer Plaintiff to Sacramento.  "[P]roximity in time

6    between the protected action and the allegedly retaliatory employment decision [is one way] a

7    jury logically could infer" that Plaintiff suffered an adverse employment action in retaliation.

8    *See Keyser v. Sacramento City Unified Sch. Dist.,* 265 F.3d 741, 751–52 (9th Cir. 2001) (internal

9    quotation marks omitted) (citing *Schwartzman v. Valenzuela*, 846 F.2d 1209, 1212 (9th Cir.

10   1988)).  Thus, there is evidence in the record that establishes a prima facie case as to retaliation

11   based on the Sacramento Field Office transfer.

12          The burden then shifts to Defendant to articulate legitimate, non-discriminatory reasons

13   for the Sacramento transfer.   ASAC Gleysteen averred that the decision was made because of

14   staffing needs due to the prior departure of another agent from Sacramento and so that Plaintiff

15   could be supervised directly by RAC Downs.  Gleysteen Decl. ¶ 31.  These reasons are

16   legitimate, non-discriminatory reasons for the decision to transfer Plaintiff, and accordingly, the

17   burden shifts to Plaintiff to present evidence that demonstrates a genuine issue of material fact

18   exists as to whether these reasons are pretext.  "In some cases, temporal proximity can by itself

19   constitute sufficient circumstantial evidence of retaliation for purposes of both the prima facie

20   case *and the showing of pretext*."  *Dawson v. Entek Int'l*, 630 F.3d 928, 937 (9th Cir. 2011)

21   (emphasis added) (citing *Bell v. Clackamas Cnty.*, 341 F.3d 858, 865-66 (9th Cir. 2003) and

22   *Miller v. Fairchild Indus., Inc.,* 797 F.2d 727, 731-32 (9th Cir. 1986)).  But these issues about

23   who knew what and when are factual.  There is a genuine issue of material fact as to whether

24   Plaintiff's January, 2006 transfer to Sacramento was retaliation for engaging in protected activity

25   several days before.  "[E]vidence based on timing can be sufficient to let the issue go to the jury,

26   even in the face of alternative reasons proffered by the defendant."  *Passantino v. Johnson &*

27

28   thereabouts, it probably would have been on maybe the 18th, I probably told him what I was
     doing and what we were doing."  Gleysteen Dep. at 67:18-24 (Bouman Decl., Ex. 26).

*Johnson Consumer Prods., Inc.,* 212 F.3d 493, 507 (9th Cir. 2000).  Accordingly, summary judgment as to this retaliation claim is DENIED.

### 4.    Transfer to the Houston Detail

Plaintiff claims ATF ordered Plaintiff to a six-month detail in Houston, Texas in February 2006 as retaliation for participating in the EEO process.  SAC ¶¶  87-88.  Plaintiff, however, never went to Houston because he underwent elbow surgery in February, 2006, and remained on sick leave for several months afterwards.   September 20, 2012 Cefalu Dep. at 513:15-25 (admitting Plaintiff never went to the Houston detail) (Conrad Decl., Ex. A); Downs Decl. ¶¶ 43-44.  While transfer of job duties may constitute an adverse employment decision, *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987), Plaintiff never reported for duty in Houston because he was out on medical leave.  In contrast to the Sacramento transfer, for which Plaintiff appeared for work for several days, Plaintiff's transfer to Houston was never "implemented, and therefore [never] became sufficiently 'final or lasting' to support a prima facie claim." *Marrazzo v. Leavitt*, 719 F. Supp. 2d 1297, 1308 (D. Or. 2010) (citing *Brooks*, 229 F.3d at 930).[13]  An unimplemented transfer would not be reasonably likely to deter an employee from engaging in protected activity.  *Ray,* 217 F.3d at 1243.  Because Plaintiff failed to present evidence establishing a prima facie retaliation claim, summary judgment arising out of a claim relating to the Houston transfer is GRANTED.

### 5.    Proposed Three Day Suspension

In February, 2006, RAC Downs met with Plaintiff, provided him with a Notice of Proposal to Suspend for Three Days, and informed Plaintiff that ATF intended to suspend him

---

[13]Plaintiff correctly observes that *Brooks,* decided in 2000, pre-dates *White*, decided in 2006, Opp'n at 16, and that *White* announced the rule that a challenged action is materially adverse when it "might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *White*, 548 U.S. at 68.  *Brooks* however, post-dates and cites to *Ray v. Henderson*, which announced the rule in this Circuit that an adverse employment action is cognizable "if it is reasonably likely to deter employees from engaging in protected activity."  *Brooks*, 229 F.3d at 929 (citing Ray, 217 F.3d at 1243).  *White* and *Ray* are thus substantially similar in their focus on objective deterrent effect.  Plaintiff cites no authority calling into question the holding of *Brooks*.  *White* and *Ray*'s rules are not inconsistent with *Brooks*' requirement that the adverse employment action have some degree of finality. Indeed, a challenged adverse employment action would be most reasonably likely to deter an employee from engaging in protected activity when the challenged action is sufficiently final or lasting.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

as discipline for prior misconduct and insubordination.  Downs Decl. ¶ 43 & Ex. E.  ASAC Gleysten decided that the suspension was to be held in abeyance pending Plaintiff's detail to Houston.  Gleysten Decl. ¶ 38.  Plaintiff went out for elbow surgery, remained on sick leave, and never reported to Houston.  The proposed suspension was never issued, and ASAC Gleysteen rescinded it when Plaintiff returned to duty as a Special Agent in April 2007.  Gleysteen Decl. ¶ 53; Cefalu Dep. at 119:15-22 (Bouman Decl., Ex. 24).  A suspension that is merely proposed but never actually issued or served does not rise to the level of a sufficiently final or lasting adverse action necessary to support a prima facie claim.  *Brooks*, 229 F.3d at 930*; Baloch v. Kempthorne*, 550 F.3d 1191, 1199 (D.C. Cir. 2008) (finding proposed decision on possible 30-day suspension not materially adverse because "courts have been unwilling to find adverse actions where the suspension is not actually served"); *Whittaker v. N. Ill. University,* 424 F.3d 640, 647 (7th Cir. 2005) ("[A] suspension without pay that is never served does not constitute an adverse employment action").   An unimplemented suspension is not reasonably likely to deter an employee from engaging in protected activity. *Ray,* 217 F.3d at 1243.  Because Plaintiff failed to present evidence establishing a prima facie claim for this issue, summary judgment is GRANTED as to the three-day proposed suspension retaliation claim.

### 6. Denial of FATS Qualification

To the extent Plaintiff construes ATF's refusal to allow Plaintiff to qualify using FATS computer simulation as a retaliation claim, such a claim fails as a matter of law. Plaintiff claims he amended his EEOC complaint on March 23, 2006 and that ATF's denial of FATS qualification occurred within three months of Plaintiff's amendment.  Opp'n at 19. Plaintiff presented no evidence that disputes that his own doctors opined that he was unable to lift a gun, was permanently disabled, and was unable to serve as an ATF Special Agent. Gill Decl., Ex. A.  Plaintiff presented no evidence that denial of the FATS qualification caused Plaintiff to lose his Special Agent status, but rather, the evidence indicates that he lost his Special Agent status because of his underlying medical condition which prevented him from performing the essential function of the job. *See infra* at Part II.  Denial of the ability to qualify to carry a firearm for use in a job for which an employee is no longer medically able

to perform cannot reasonably be categorized as an adverse action because it is, at most, a non-actionable "trivial harm." *White*, 548 U.S. at 68. Because denial of the opportunity to participate in FATS qualification when an employee is no longer able to perform the job would not reasonably deter an employee from engaging in protected activity, *Ray,* 217 F.3d at 1243, Plaintiff cannot establish a prima facie retaliation claim for this issue. Summary judgment for this retaliation claim is GRANTED.

### 7.    Intelligence Program Specialist Position

Plaintiff contends that he amended his EEOC complaint on August 16, 2006, and that in September 2006, he was faced with a choice between termination and accepting the non-Special Agent IPS position in Washington, D.C. He argues that ATF's offer of this position "constituted a materially adverse action because Plaintiff and his family would have to move across the country . . . [and] Plaintiff would not be able to enjoy any of the benefits of being an ATF special agent." Opp'n at 17. The undisputed evidence shows that Plaintiff never physically relocated to Washington, D.C., briefly reported to the Dublin Field Office during the transition period to Washington, D.C., but instead chose to have surgery again and went on medical leave. December 11, 2012 Cefalu Dep. at 525:9-527:12 (Conrad Decl., Ex. A); Declaration of Stephen K. Martin ("Martin Decl.") ¶ 6. Following a successful surgery, Plaintiff returned to duty as a Special Agent in April 2007. Cefalu Dep. at 532:5-533:16 ( Conrad Decl., Ex. A). Offering the IPS position as an accommodation to an employee who can no longer perform work as a Special Agent does not constitute an adverse employment action because it is not the type of action that "might have dissuaded a reasonable [person] from making or supporting a charge of discrimination." *White,* 548 U.S. at 68; *Ray,* 217 F.3d at 1243. Moreover, Plaintiff never moved to Washington, D.C. to fulfill the IPS position and thus it was not a lasting or final adverse employment action. *Brooks,* 229 F.3d at 930. Even if it were, Plaintiff presented no evidence establishing a causal link between engaging in a

26

**United States District Court**
For the Northern District of California

1    protected activity and the offer of the position.[14]  Summary judgment is GRANTED as to this

2    claim.

3        **8.    Damage to Plaintiff's ATF Badges**

4        After Plaintiff initially refused to accept the IPS job transfer and was given a notice of

5    termination, RAC Downs collected Plaintiff's ATF badges and credentials on October 31,

6    2006.  May 8, 2007 Cefalu Dep. at 205:17-206:10 (Bouman Decl., Ex. 24); September 20,

7    2012 Cefalu Dep. at 537:1-15 (Conrad Decl., Ex. A).  Plaintiff's badges were sent to ATF

8    headquarters in Washington, D.C.  Cefalu Dep. at 206:11-15, 211:10-13 (Bouman Decl., Ex.

9    24).  When Plaintiff returned as a Special Agent in March-April 2007, he was notified that

10   his badges had been damaged when they arrived at headquarters.  *Id.* at 206:16-208:24.  ATF

11   issued Plaintiff temporary badges and subsequently issued him replacement badges with the

12   original badge numbers in May 2007.  Gleysteen Decl. ¶ 53.  Plaintiff alleges his ATF

13   badges were "defaced intentionally" while in the custody of his SFFD supervisors.  SAC ¶

14   120.  Contrary to Plaintiff's argument, even if the badges were intentionally defaced, such

15   defacement would not be *direct* evidence of retaliation, "which, if believed, proves the fact

16   [of discriminatory or retaliatory animus] without inference or presumption."  *Coghlan*, 413

17   F.3d at 1094-95.[15]  Concluding that the badges were damaged in retaliation for engaging in

18   protected activity requires an inferential leap, and requires Plaintiff to nonetheless present

19   evidence establishing a prima facie case of retaliation.  Fatal to this claim is defacement of

20   government-issued identification and badges, even if true, would not rise to the level of an

21   ───────────────────

22      [14]Plaintiff may contend that a retaliation claim exists for ATF's issuance of away
     without leave ("AWOL") status for failure to report to duty as required on November 14,
23   2006, Opp'n at 10, 23-24; Bennett Decl., ¶¶ 3-4 & Ex. A at ¶ 14.  Plaintiff presented no
     evidence that ATF's articulation of legitimate, non-discriminatory reasons for placing
24   Plaintiff on AWOL status were pretext.  Summary judgment is therefore GRANTED for this
     claim as well.

25      [15]Plaintiff's citation to *Jones v. UPS Ground Freight*, 683 F.3d 1283 (11th Cir. 2012)
26   is inapposite because that case involved an inference of discriminatory animus in a hostile
     work environment claim as opposed to retaliation claims.  Plaintiff, here, presented no direct
27   evidence of discriminatory animus.  Even if Plaintiff's badges were scratched, that action is
     distinguishable from the repeated instances of race-based harassment in *Jones* because
28   Plaintiff's badges were promptly replaced and damage to government-issued badges does not
     rise to the level of an adverse employment action.

United States District Court

For the Northern District of California

adverse employment action.  The test for whether a challenged action rises to the level of an adverse employment action is an objective one.  *White*, 548 U.S. at 68.  Unlike adverse employment actions such as a termination, negative reference, negative performance review, or refusal to consider for promotion, *Brooks*, 229 F.3d at 929 n. 11 (collecting cases), defacement of an employee's government-issued badges and credentials, which were promptly replaced, is not sufficiently final or lasting and would not reasonably deter an employee from engaging in protected activity.  *Brooks*, 229 F.3d at 930; *Ray,* 217 F.3d at 1243.  Accordingly, summary judgment as to the retaliation claim involving the badges is therefore GRANTED.

### 9. Second Transfer to Sacramento

On January 17, 2007, Plaintiff sent an email to Wanda Gill, a human resources specialist with the Office of Workers Compensation Programs, copying ASAC Gleysteen and SAC Martin, notifying ATF that his treating physician had cleared him to return to full duties as a Special Agent, and requested to be stationed in Stockton, California.  Pl.'s Ex. 8.  Later that day, SAC Martin wrote to ASAC Gleysteen stating "Let's confirm with Travel that we can place Vince in Sacto with a sup whom he does not have an EEO against – w/o a PCS."  Pl.'s Ex. 9.[16]  Plaintiff contends this is direct evidence that "Plaintiff's EEOC activity unlawfully was considered as a factor in the ATF's decision making process."  Opp'n at 13.  SAC Martin's statement is not the type of direct evidence "which, if believed, proves the fact [of discriminatory or retaliatory animus] without inference or presumption," nor is it direct evidence that "consists of *clearly* sexist, racist, or similarly discriminatory statements or actions by the employer."  *Coghlan*, 413 F.3d at 1095 (internal citation and quotation omitted) (emphasis added).  Rather, it is circumstantial evidence which requires inference from a fact-finder.  Plaintiff must still present evidence that would establish a prima facie retaliation case.

---

[16]This email is admissible as a statement offered against ATF as made by ATF's employee, SAC Martin. FRE 801(d)(2)(D).

1    Plaintiff suggests this "second" transfer occurred in January 2007, two months after

2  his November 29, 2006 EEO complaint amendment.  Opp'n at 18.  While amending an EEO

3  complaint is a protected activity, Plaintiff fails to establish that this second transfer is an

4  adverse employment action because the contemplated transfer was never effectuated.  *See*

5  Mar. 7, 2008 Declaration of Stephen Martin, Martin Decl., Ex. C ¶ 2 (averring that "I

6  considered transferring [Plaintiff] to the Sacramento Field Office; however, after speaking

7  with [Plaintiff] who advised such a transfer would mean a deduction in pay as the

8  Sacramento Field Office has a lower pay scale than the Stockton and Dublin offices, I

9  decided not to transfer [Plaintiff] to Sacramento").  Plaintiff cited no evidence creating a

10  genuine dispute of material fact that he served in Sacramento pursuant to this transfer or

11  otherwise lost benefits because of the contemplated transfer.  Like Plaintiff's never-

12  effectuated transfer to Houston, Plaintiff's second transfer to Sacramento is not an adverse

13  employment action as a matter of law.  First, a contemplated transfer that is not effectuated

14  because an employer grants an employee's request not to go cannot be an adverse action

15  because it is not one that would "dissuade[ ] a reasonable worker from making or supporting

16  a charge of discrimination." *White*, 548 U.S. at 68.  Second, because the transfer was never

17  implemented, it was not "sufficiently final to constitute an adverse action" and therefore

18  support a prima facie claim.  *Brooks*, 229 F.3d at 930.  Summary judgment as to Plaintiff's

19  retaliation claim arising from the this claim is GRANTED.

20    **10.    Senior Operations Officer Assignment**

21    Plaintiff claims retaliation based on his assignment as the Special Operations Officer

22  ("SOO") in Dublin when he returned to duty in April 2007.  SAC. ¶¶ 118-119, 124-129.

23  Plaintiff contends the SOO position is "materially adverse because it is not in the field"

24  because "[w]hen one thinks of an ATF special agent, the first thing that comes to mind is

25  someone conducting undercover investigations, not someone with a full-time desk job."

26  Opp'n at 18.  Plaintiff asserts in his Opposition brief that he was given "very few

27  responsibilities" and "idled" as SOO.  Plaintiff does not dispute that the SOO position is held

28  by ATF Special Agents such as Plaintiff.  Declaration of Debora Livingston ("Livingston

29

Decl.") ¶ 4.  Plaintiff instead argues that he was not assigned appropriate job duties and not given training.  "[R]eassignment of job duties is not automatically actionable.  Whether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and 'should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'"  *White*, 548 U.S. at 71 (citation omitted).  Plaintiff presented no evidence showing that he was given inappropriate job duties or that ATF failed to provide him needed training.

Assuming, *arguendo*, that Plaintiff had presented evidence sufficient to establish his prima facie case showing that assignment to the SOO position and performing the duties associated with it were adverse employment actions caused by engaging in protected activity, Defendant has presented undisputed evidence that Plaintiff's assignment as SOO was done in a legitimate, non-discriminatory manner and that Plaintiff was offered training and given assignments.  Martin Decl. ¶ 7 (averring that he assigned Plaintiff to the SOO position in the Dublin Field Office because the "Special Agent who had been serving as the Tactical Operations Officer – and had been performing the duties of a Senior Operations Officer . . . had retired"); Livingston Decl. ¶ 4 (Plaintiff's first-line supervisor averring that "[w]hen I supervised Agent Cefalu, I provided him with work to do" that included maintaining property inventory, maintaining the ATF vehicle fleet, and offered to provide training to Plaintiff on using Microsoft Excel).  Defendant has therefore produced evidence to satisfy its burden that the assignment and duties of the SOO position were made in a legitimate, non-discriminatory manner.

Plaintiff failed to present any evidence of pretext.  Plaintiff cites a July 22, 2010 letter from ATF's EEO Office noting that the claims Plaintiff "alleged" and which were referred for investigation included allegations that Plaintiff received a directed reassignment to Dublin, California, was not assigned duties appropriate to the Special Agent position, and did not receive training for some new duties (Inventory Audit).  Plaintiff's Ex. 15.  A promise from the EEO Office to investigate allegations made by Plaintiff is not specific and

United States District Court

For the Northern District of California

1  substantial evidence of pretext.  Accordingly, summary judgment is GRANTED as to this

2  retaliation claim involving the SOO assignment and duties.

3  **11.    Use of Government Credit Card**

4  In March 2008, a SFFD financial officer noticed that Plaintiff had used his

5  government credit card at a resort in Lake Tahoe while he was out of the office on annual

6  leave and brought it to the attention of Plaintiff's supervisor, Division Operations Officer

7  Thomas Lyster.  Declaration of Thomas Lyster ¶ 11.  Lyster sent ATF's Internal Affairs

8  Division ("IAD") an email relaying the facts as he understood them.  *Id.* at ¶¶ 11-12 & Ex. D.

9  IAD conducted an investigation and no action was taken by ATF against Plaintiff.

10 Declaration of Daniel Machonis ("Machonis Decl."), Exs. A-C.  Plaintiff included

11 allegations related to this claim in his original Complaint but omitted these claims in the

12 SAC.  Defendant moved for summary judgment on this claim.  Plaintiff did not address it in

13 his opposition and failed to produce any evidence indicating that IAD's investigation

14 constitutes an adverse employment action, especially where no action was taken against

15 Plaintiff by ATF.  *Cf. Baloch*, 550 F.3d at 1199 (no claim lies where suspension "not actually

16 served").  To the extent Plaintiff maintains a retaliation claim in this issue, summary

17 judgment is GRANTED.

18 **12.    Plaintiff's Appearance on CNN**

19 In May 2010, Plaintiff appeared in a segment on CNN's Anderson Cooper 360º, in

20 which he described how he was paid "good money for not a lot of work," and had been

21 "idled" in his duties in response to whistleblowing activities.[17]  Def.'s Req. for Judicial

22 Notice, Ex. J (video excerpt of May 27, 2010 broadcast).  On September 8, 2010, Plaintiff's

23 supervisor, Division Operations Officer Debora Livingston delivered a memorandum to

24 Plaintiff outlining the specific work duties that were expected of him.  Livingston Decl., ¶ 7

25 & Ex. B.  Plaintiff included allegations related to this claim in his original Complaint but

26

27     [17]The Court takes judicial notice that Plaintiff appeared on CNN in May 2010 for the purpose of indicating that statements made by Plaintiff on the program were in the "public realm at the time, not whether the contents of those [statements] were in fact true." *Von*

28 *Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010) (citing *Premier Growth Fund v. Alliance Capital Mgmt.*, 435 F.3d 396, 401 n. 15 (3d Cir. 2006)).

1   omitted from the SAC mention of the May 2010 CNN appearance or subsequent

2   memorandum outlining specific work duties.  *Compare* SAC *with* Docket No. 10 ¶¶ 136-137.

3   Defendant moves for summary judgment as to this claim on the basis that Plaintiff cannot

4   claim discrimination or retaliation for being given work to do after appearing on television

5   and complaining he had none.  Mot. at 22.  Plaintiff presented no evidence related to this

6   claim, and instead argues that Plaintiff's whistleblowing activities on CNN are being litigated

7   in another forum and that "the fact that Plaintiff has engaged in whistleblowing activity

8   merely is a consideration at trial for the determination of why the materially adverse actions

9   were taken against Plaintiff."  Opp'n at 25.  The Court finds that being given a memorandum

10  containing an enumeration of specific job duties is not an adverse employment action when

11  the employee previously stated he lacked work.  Plaintiff failed to present any evidence

12  related to retaliation surrounding the May 2010 CNN appearance and thus failed to establish

13  a prima facie retaliation case based on this claim.  Summary judgment is GRANTED as to

14  this claim to the extent Plaintiff claims retaliation in the form of the assignment of additional

15  work duties stemming from this incident.[18]

### 13.   Plaintiff's Six-Day Suspension

17      Plaintiff asserts that ATF retaliated against him when he was suspended for six days

18  on July 28, 2011.  SAC ¶ 135.  Plaintiff notes that he amended his EEOC complaint on

19  January 6, 2011.  Opp'n at 20.  While amending an EEO complaint is a protected activity,

20  and a served suspension is an adverse employment action, Plaintiff failed to present evidence

21  that establishes a causal link between any of his EEO activity and ATF's decision to suspend

22  him for six days.  *Coons*, 383 F.3d at 887.

23      During the course of furnishing discovery to the Holloway criminal defendants, ATF

24  reviewed Plaintiff's government-issued computer and learned that Plaintiff had used his ATF

25  email account to send and receive allegedly racist, sexually explicit, profane, emails

26

27      [18]Plaintiff states that "[i]t is wholly inappropriate to mention Plaintiff's whistleblowing
    activities at the summary judgment posture because Plaintiff does not have to prove but-for
28  causation."  Opp'n at 25.  The Court notes that it does not consider or express any opinion as
    to any whistleblowing activities on the part of Plaintiff.

1   purportedly in violation of ATF's computer-use policies.  Mot. at 22 (citing Machonis Decl.,

2   Ex. G at 3 (describing bestiality video, photos of naked women, and emails containing racial

3   slurs and epithets)).  Plaintiff argues that he did not technically send the video containing

4   bestiality, but rather it was sent by someone else, and that ATF does not have a policy against

5   using profanity in email.  Opp'n at 21.  The Court notes these evidentiary disputes are

6   immaterial; the Court does not rely on the truth of the statements contained in the IAD report

7   on investigation (issued October 25, 2010), the PRB's suspension recommendation (issued

8   March 2, 2011), or the actual imposition of suspension by ATF's "deciding official" (issued

9   July 28, 2011).  Rather, the Court notes that each document was authored by a person other

10  than one of Plaintiff's supervisors.  *See* Machnonis Decl., Ex. G (authored by A. Michelle

11  Collen and Robert A. Schmitt); Ex. H (authored by B. Todd Martin); Ex. I (authored by G.

12  Elaine Smith).  Plaintiff presented no evidence that establishes a "nexus" between the

13  purported discriminatory or retaliatory animus allegedly held by his supervisors and the acts

14  of the relevant investigators and decision makers involved with his suspension.  *Vasquez v.*

15  *Cnty. of Los Angeles*, 349 F.3d 634, 640 (9th Cir. 2003).  Plaintiff offered no evidence that

16  could establish that these deciding officials had "knowledge of prior conflicts" involving

17  Plaintiff.  Moreover, the IAD report of investigation was issued October 25, 2010, more than

18  two months before the January 6, 2011 EEO amendment cited by Plaintiff.  Thus, Plaintiff

19  did not establish his prima facie case.  Summary judgment is GRANTED as to Plaintiff's

20  retaliation claim involving his six-day suspension.

21          **14.      Plaintiff's Application to Become the RAC of ATF's Reno Field Office.**

22          Plaintiff asserts that he was retaliated against when he was denied a supervisory

23  promotion to become the Resident Agent in Charge of the Reno Field Office.  Plaintiff

24  asserts he applied for the Reno RAC position around April 2011 and was placed on the Best

25  Qualified List, but was later removed from the BQL and thus disqualified from consideration.

26  SAC ¶¶ 136-140.  Plaintiff fails to establish a causal link between his protected activity and

27  removal from consideration for the Reno RAC position.

28

United States District Court

For the Northern District of California

1    As of July 28, 2011, ATF's independent deciding official suspended Plaintiff for six

2    days.  Based on Plaintiff's testimony in the Holloway case, in which IAD issued a report of

3    investigation, the PRB recommended on June 20, 2011 that Plaintiff's employment with ATF

4    be terminated.  Machonis, Exs. D-E.  Defendant presented undisputed evidence that Mark

5    Chait, Assistant Director of Field Operations at ATF ("AD Chait"), had discretion under the

6    ATF Merit Promotion Plan to disqualify an applicant based on derogatory information

7    provided by the Office of Professional Responsibility and Security Operations, including

8    information about a pending disciplinary action against an applicant.  Declaration of Mark

9    Chait ("Chait Decl."), ¶¶ 2-4 & Ex. A, ATF Merit Promotion Plan at ¶ 57(b)(3).  AD Chait

10   averred that OPRSO provided him with information that Plaintiff was the subject of pending

11   discipline issued by the PRB, and on that basis, AD Chait disqualified Plaintiff from

12   consideration of the Reno RAC position, notifying him of the disqualification on September

13   16, 2011.  Chait Decl. ¶ 6 & Ex. B.  Plaintiff's brief offered no evidence that AD Chait knew

14   about (much less took into account) any of Plaintiff's protected activity.  *Vasquez*, 349 F.3d

15   at 640; *Cohen*, 686 F.2d at 796 ("Essential to a causal link is evidence that the employer was

16   aware that the plaintiff had engaged in the protected activity").  Even if Plaintiff had

17   submitted such evidence and were able to establish a prima facie case (which he has not),

18   Plaintiff presented no evidence that AD Chait's legitimate, non-discriminatory reason (the

19   existence of pending discipline) was pretext for disqualifying Plaintiff.  Accordingly,

20   summary judgment as to this claim is GRANTED.

21

22   **IV.    Monetary Damages for Retaliation Under the Rehabilitation Act**

23        Defendant moved for summary adjudication with respect to Count IV (retaliation

24   stemming from the Rehabilitation Act) to the extent Plaintiff seeks money damages.  Mot. at

25   25.  Plaintiff failed to address this argument in his opposition brief.  Prior to oral argument,

26   the Court asked Plaintiff whether he conceded that summary judgment would be appropriate

27   on this issue.  During oral argument, Plaintiff asserted that he did not concede this issue and

28   cited several cases in support of his position.

United States District Court

For the Northern District of California

1    Defendant cites *McCoy v. Department of the Army*, 789 F. Supp. 2d 1221, 1234 (E.D.

2  Cal. 2011) for the proposition that compensatory damages are not available for retaliation

3  claims under the Rehabilitation Act.  In that case, the district court relied on two controlling

4  Circuit cases.  The first case, *Ferguson v. City of Phoenix,* held that because the remedies for

5  violations of the ADA and the Rehabilitation Act are co-extensive with each other, and are

6  linked to Title VI of the Civil Rights Act of 1964, the ADA and Rehabilitation Act remedies

7  must be construed the same as remedies under Title VI.  157 F.3d 668, 673 (9th Cir. 1998)

8  (citing 42 U.S.C. § 12133 & 29 U.S.C. § 794a(a)(2)).  The second case, *Alvarado v. Cajun*

9  *Operating Company*, held that "punitive and compensatory damages are not available for

10  ADA retaliation claims."  588 F.3d 1261, 1269 (9th Cir. 2009).  Combining the holdings of

11  *Ferguson* and *Alvarado*, the *McCoy* district court held that "it appears that in this circuit

12  compensatory damages are not available for retaliation under the Rehabilitation act."

13  *McCoy*, 789 F. Supp. 2d at 1234.

14    During oral argument, Plaintiff directed the Court to *Herrera v. Giampietro*, No. 1:09-

15  CV-01466-OWWSKO, 2010 WL 1904827, at *9 (E.D. Cal. May 10, 2010).  In that case, the

16  district court held that a plaintiff may be entitled to monetary damages for her ADA

17  retaliation claim against a public school district.  The *Herrera* court distinguished *Alvarado*

18  because the defendant in *Herrera* was a school district, which was a public entity, governed

19  by 42 U.S.C. § 12133 whereas the defendant in *Alvarado* was a private entity governed by 42

20  U.S.C. § 12117.  Citing *Barnes v. Gorman*, 536 U.S. 181, 184-85 (2002), the *Herrera* court

21  held that the remedies available pursuant to section 12133 are coextensive with the remedies

22  available in a private cause of action brought under Title VI of the Civil Rights Act of 1964,

23  which include monetary damages.  Thus, based on *Herrera*, Plaintiff here could argue that

24  the Rehabilitation Act's retaliation provision, when applied to public entities such as the

25  ATF, allow for monetary damages.  However, as the specific issue of whether monetary

26  damages are available for retaliation claims under the Rehabilitation Act has not been

27  decided by the Circuit, and this issue was not fully briefed by the parties, the Court finds that

28

granting summary judgment on this issue to Defendants at this time would be inappropriate. Summary judgment as to this issue is therefore DENIED.

**CONCLUSION**

For the reasons set forth above, the Defendant's motion for summary judgment is GRANTED as to Count I (the ADEA cause of action), Count II (the Rehabilitation Act cause of action), and all claims within Counts III and IV (retaliation), with the exception of the retaliation claim relating to the January 2006 transfer to Sacramento, for which summary judgment is DENIED.

**IT IS SO ORDERED.**

Dated:   09/23/13

THELTON E. HENDERSON, JUDGE
UNITED STATES DISTRICT COURT

36